[No. 11956.   Department One. — November 12, 1887.]

In the Matter of the Estate of FREDERICK ZEILE, Deceased. MARIE M. HUMMEL, Appellant.

Will — Advancements — Subsequent Legacies — Specific Legacies. — The testator, a resident of San Francisco, by his will there executed on the nineteenth day of May, 1883, bequeathed to certain of his relatives residing in Germany one thousand shares of the stock of the Bank of California. the same to be sold by his executors, and the proceeds divided among them in stated proportions. The will provided that any advancements that the testator might "hereafter personally make to the above-named legatees, or to either of them, shall be deemed a partial satisfaction of said legacy, equal in amount to the sum so advanced." Subsequent to the execution of the California will, the testator went to Germany, and there executed a supplemental will, or codicil, in which, after expressly ratifying the former will, and directing that the testamentary dispositions thereof should remain unchanged, he bequeathed to the same relatives and to others a large sum of money, which he had arranged to have sent from California. *Held*, that the bequests of the bank stock were specific legacies, and that the legacies given by the codicil were cumulative, and not substitutionary, and were not advancements within the meaning of that term, as used in the former will.

Appeal from a judgment of the Superior Court of the city and county of San Francisco distributing the estate of a deceased person, and from an order refusing a new trial.

The facts are stated in the opinion of the court.

*J. B. Reinstein*, and *J. M. Seawell*, for Appellant.

The legacies given by the Rottweil codicil are merely cumulative. (2 Bouv. Law Dict., p. 21, and cases cited; 2 Redfield on Wills, 178–181, 507; *De Witt* v. *Yates*, 10 Johns. 156; 6 Am. Dec. 326; *Hurst* v. *Beach*, 5 Madd. 351; *Duke of Albans* v. *Beauclerk*, 2 Atk. 636; *Cunningham* v. *Spickler*, 4 Gill, 280; *Masters* v. *Masters*, 1 P. Wms. 422; *Ives* v. *Dodgson*, L. R. 9 Eq. 401; *Osborne* v. *Duke of Leeds*, 5 Ves. 369; *Martin* v. *Drinkwater*, 2 Beav. 215.) The legacies given by the codicil were not advancements, within the technical meaning of that term, or as it is used in the will. (*Fennell* v. *Henry*, 70 Ala. 484; *Grey* v. *Grey*, 22 Ala. 233; *Harley* v. *Harley*, 57 Md. 342; *Fellows* v. *Little*, 46 N. H. 27; *Yundt's Appeal*, 13 Pa. St. 575; 53 Am. Dec. 496; *Grattan* v. *Grattan*, 18 Ill. 167; 65 Am. Dec. 726; *Calender* v. *McCreary*, 5 Miss. 356; *Christy's Appeal*, 1 Grant Cas. 369; *Crosby* v. *Covington*, 24 Miss. 619; *Chase* v. *Ewing*, 51 Barb. 597; *Grattan* v. *Grattan*, 18 Ill. 167; 65 Am. Dec. 496; *Osgood* v. *Breed*, 17 Mass. 358; *Cawthorn* v. *Coppedge*, 1 Swan, 487; *Dillman* v. *Cox*, 23 Ind. 440.) An advancement cannot be made by will. (*Cooper* v. *Cooper*, L. R. 8 Ch. App. C. 813; *Edwards* v. *Freeman*, 2 P. Wms. 445; Civ. Code, secs. 1342, 1397.)

*Selden S. & George T. Wright, Joseph P. Kelly, Sawyer & Burnett, S. Heydenfeldt*, for the executors and certain legatees.

The legacies given by the codicil were intended as advancements, whether that term be interpreted according to its technical meaning, or in a more general and

enlarged sense. (*Weall* v. *Rice,* 2 Russ. & M. 267; Civ.
Code, sec. 1396; 1 Pomeroy's Eq. Jur., secs. 554 et seq.;
*Onslow* v. *Mitchell,* 18 Ves. 490; *Leake* v. *Leake,* 10 Ves.
489; *Noel* v. *Lord Walsingham,* 2 Sim. & S. 99; *Fazakerley*
v. *Gillibrand,* 6 Sim. 591; *Papillon* v. *Papillon,* 11 Sim. 642.)

*Edmund Tauszky, M. S. Eisner,* and *William Loewy,* for
other legatees.

McKINSTRY, J.—Deceased died at Monte Carlo, Mo-
naco, April 26, 1884, being then a resident of San Fran-
cisco, and leaving property in that city and county.  He
left a will, executed and published in this state on the
19th of May, 1883, which was duly probated in San
Francisco, a portion whereof reads: "Item 6. I give
and bequeath unto my relatives residing in Germany
one thousand (1,000) shares of the stock of the Bank of
California, the same to be sold by my executors at or as
soon after my decease as is practicable, for its reason-
able value, and the proceeds to be divided as follows, to
wit:—

"To my sister, Mathilde, one fourth ($\frac{1}{4}$).

"To the children, residing in Germany, of my brother
David, one fourth ($\frac{1}{4}$), share and share alike.

"To the children of my dead sister, Mrs. Maier, one
fourth ($\frac{1}{4}$), share and share alike.  To the children of
my dead sister, Mrs. Froescher, one fourth ($\frac{1}{4}$), share
and share alike.

"And I hereby declare that any advancements that I
may hereafter personally make to the above-mentioned
legatees, or to either of them, shall be deemed a partial
satisfaction of said legacy, equal in amount to the sum
so advanced, and I direct that an equal amount shall be
deducted from the proceeds of the sale of bank stock and
added to my residuary estate."

Subsequent to the execution of the will in California,
decedent left for Europe, and at Rottweil, Wurtemburg,

on the 17th of August, 1883, made a supplemental will, or codicil, portions whereof read:—

"I. I have already disposed by testament of my estate in California. That testamentary disposition shall remain unchanged, and I again ratify the same.

"II. However, I have already made arrangements to have a sum of money sent from California to a bank in Germany or Wurtemburg, of which I shall dispose in favor of other relatives. The following sums of money shall be paid:—

"1. To my sister, Mathilde Zeile, unmarried, at Reutlingen, sixty thousand (60,000) marks.

"2. To my brother, David Zeile, of the town of Weil, fifty thousand (50,000) marks.

"3. To the wife of the tanner Hummel, at Ruetlingen, whose first name at this moment I do not remember, daughter of my deceased sister, whose name I do not just now recall, formerly widow of the baker Maier of Tubigen, seventy-five thousand (75,000) marks.

"4. To the children of my deceased sister, Gottlobin, formerly wife of the tanner Froescher, of Reutlingen, to wit:—

"(a) To the son, who is tanner in the upper country, and is married, whose first name is at this instant unknown to me, twenty-five thousand (25,000) marks.

"(b) To her daughter Paulline, now living, widow of the architect Fuchs, at Ruetlingen,—that is, to each of the children of this marriage, minors, whose names are at this instant unknown to me,—twenty thousand (20,000) marks; with proviso that the income is to go to the children, and that there shall be a guardianship of the estate until they become of age or marry.

"(c) To her daughter, Mathilde, now living, wife of the manufacturer Haux, at Ruetlingen,—that is, to the children born and to be born of this marriage (there are four children at present),—jointly, (50,000) fifty thousand marks; with the proviso that the income goes to the

children; that there shall be a guardianship of the estate until they arrive at the age of majority, or until they marry; and that at that point of time they are to receive their shares; that in case of the possibility of other children being born, the guardians' court will have to determine how such shall be paid over; and also with the further proviso that if one of these children should die during the age of minority, the share of such child shall go to his brothers and sisters. The children living shall hold in trust for the children born hereafter.

" III. All the personal property of any kind, as well as money which I shall leave in Germany at my decease, beyond that of which I have disposed in the foregoing paragraph, shall go to the four branches named in the foregoing paragraph, in such manner that only those mentioned in the foregoing paragraph shall be entitled, and that those of each branch are to share with each other in the proportion of the sums given them in the foregoing paragraph.

" IV. If, unexpectedly, the funds in Germany should. be insufficient for the purpose of paying the sums in paragraph 2, then the heirs of the estate in California. shall supply the deficiency.

" VII. All bequests which I have made, or which I shall make, shall by this last testamentary disposition be expressly confirmed, whether these bequests are given to relatives, strangers, or for charitable purposes and institutions. Likewise, any testamentary papers written or subscribed by me shall have the same effect as if they were here incorporated."

On application for distribution of the proceeds of the bank stock,—which had been sold by the executors by order of the court,—the superior court found that no part of such proceeds had been paid to Mathilde Zeile, sister of testator, or to Marie M. Hummel, daughter of testator's sister, Mrs. Maier, or to Karl Froescher, son of the

sister of testator, Mrs. Froescher. Also that the sum bequeathed to Marie M. Hummel, appellant, by the Rottweil will, or codicil, was more than her share of the proceeds of the bank stock.

And the court held that the sums of money bequeathed by the Rottweil will, or codicil, to the persons mentioned in item 6 of the California will were intended by the testator to be, and were, "advancements," within the meaning of the term as used in item 6, and should be deducted from the legacies given to the same persons in that item.

The superior court treated the legacies given by item 6 of the California will as "specific legacies," and no question has been made by either party as to the correctness of that ruling. The thousand shares of bank stock were to be sold by the executors, and the proceeds divided among the legatees named. The dividends collected by the executors were incidents to the stock, and were, of course, to be distributed in like proportions with the proceeds of sale. The will did not merely provide that sums of money should be distributed to the legatees, payable primarily out of the fund arising from the sale. The legacies were not merely demonstrative: they were specific; if the shares of stock had become worthless, the legatees would have been entitled to nothing..

There is no question of *ademption*, in the strict sense, here. The specific thing has never been taken away; the bank stock continued to be a portion of testator's property until his death, and was a part of his estate afterward.

But the first question, as applied to this appeal, is, What was the specific legacy left to Marie M. Hummel?

The legacy to her was not of one eighth ($\frac{1}{8}$) of the proceeds of the one thousand shares of bank stock, absolutely; but of one eighth, less the amount of any "advancements" the testator might "personally make" to her after the execution of the California will.

Whatever the nature of the " advancements," they were to be personal acts of Frederick Zeile in his lifetime.

It would seem plain, also, that, whether or not the execution of a will containing provisions like those last above recited was intended by the testator — when the California will was made — to constitute an " advancement " to appellant of an amount equal to the legacy to her named in such an instrument, must depend upon the language of the California will, and the effect of oral testimony, if any, properly admissible, to explain the intent of the testator when the California will was made.

Whether the legacy to appellant in the first instrument was satisfied by a bequest in the subsequent instrument (intended as a substitute for that legacy) is a different question. The California will was republished at Rottweil, and all its provisions reaffirmed and ratified.

Unless the term " advancements " of itself included a legacy mentioned in a subsequent codicil, or the language of the second instrument, in connection with that of the first,— or of such language with oral testimony, properly admitted, to explain the first instrument,— shows the testator intended the second legacy to be in substitution or satisfaction for the legacy in the California will, the second legacy must be held to be cumulative. It is well settled — except where the two legacies are for the same sum, and both testamentary instruments express the same motive for the gift — that, where a testator gives a legacy of quantity, *simpliciter*, and also a second legacy of quantity to the same legatee, the second legacy is regarded as cumulative, and not as substitutionary, unless the language of the second will or codicil shows an intent to the contrary.

Whether the testator meant when he used the word " advancement " that any legacy he might give in a subsequent will or codicil to one of the persons named in item 6 should be deemed an advancement is to be determined by reference to the language of the California

will, and the evidence showing the circumstances surrounding the deceased when he made that will.

Whether, when he provided a legacy for appellant in the Rottweil will, he intended the same as a substitute for the legacy left her in the California will, and not as cumulative, is to be determined by reference to the language of the Rottweil will, or of the Rottweil and California wills together, in the light of the testator's then surroundings, and of events (so far as evidence of such was admissible) which preceded its execution.

Prior to our codes, the term "advancements" was applied to gifts by a parent (in his lifetime) to a child, of the whole or a part of what it is supposed the child would inherit from the parent; sometimes, also, to such gifts by one standing *in loco parentis*. By the Civil Code, the term is extended so as to include like gifts by an ancestor to a child, "or other lineal descendant." (Civ. Code, secs. 1395–1399.)

It may be conceded, as claimed by respondents, that the word is not employed in item 6 as in the provisions of the Civil Code. It by no means follows, however, that the testator intended the word to embrace any legacy to one of the same persons which he might give by a subsequent testamentary instrument not revocatory of the will in which the word is found.

Webster gives as definitions of *advancement*, "the payment of money in advance; money paid in advance." A payment in advance implies a payment *beforehand*,—before an equivalent is received, or before the happening of an event in the contemplation of the parties to a contract. When used in a will, unless another event is mentioned prior to which the advance is to be made, or the context otherwise indicates a different meaning, the words "payments in advance, to be applied in satisfaction of a legacy," import payments prior to the happening of the event on which the will is to take effect, to wit, the death of the testator.

Counsel for respondents cite Professor Pomeroy's work on Equity Jurisprudence as authority for the proposition that the legacy to appellant in the Rottweil will was an *advancement* within the meaning of the word as used in the California will. The learned writer, speaking of the effect of a legacy in a will made *after* a settlement on a child, says: " The settlement or agreement to give a portion may sometimes contain a provision to this effect: that if the parent should afterward, during his lifetime, make an advancement to the donee, such advancement should be a complete or partial satisfaction of the portion. If, instead of making a technical advancement, the parent should afterward, by his will, leave a legacy or a residue, the legacy given under such circumstances is held to be a compliance with the provision, and to operate as a satisfaction in full or in part of the portion." (1 Eq. Jur., sec. 567.) He cites in a note *Onslow* v. *Mitchell,* 18 Ves. 490; *Noel* v. *Lord Walsingham,* 2 Sim. & S. 99; *Fazakerly* v. *Gillebrand,* 6 Sim. 491; *Papillon* v. *Papillon,* 11 Sim. 642.

We have not had access to the Irish report, but it would seem the English cases, although they appear to do so, when examined and explained do not support the text. (See *Cooper* v. *Cooper,* L. R. 8 Ch. App. 825, 826.)

However this may be, Mr. Pomeroy shows very clearly in another place that the doctrine of presumptions, applicable with respect to the dealings of a *parent* as to a *child,* has no place in cases like the present. (1 Eq. Jur., sec. 548.)

Lord Romilly, M. R., said: " It is of parmount importance to consider in all cases . . . . whether the doctrine of presumption against double portions, or the doctrine of construction of instruments, applies. . . . . If the original gift was to a stranger, the doctrine of satisfaction becomes applicable according to the words of the original donor." (L. R. 8 Ch. App. 819, note.)

In the case before us, the testator might have used language to indicate that by "advancement" he meant, not only a gift of money or property prior to his death, but also a subsequent bequest to a legatee named in the California will. But in the absence of such language, there is no *presumption* that he used the word in a sense differing both from its technical and popular signification. As it was not employed as a technical term, the presumption is, he employed it in the sense approved in general literature and by common usage. The language in immediate connection with " advancements " strengthens rather than weakens the hypothesis that the testator intended a gift in his lifetime,—"Any advancements that I may hereafter *personally* make," etc.

It is true, a subsequent codicil would be made by him, and made by him in his lifetime. But the words, while apt and appropriate in respect to gifts consummated in his lifetime, are such as would not ordinarily or " naturally " be resorted to when the testator was speaking of gifts to take effect only on his death. In the latter case, the substance of the thing to be conferred would not be delivered by the testator personally, but by his executors after his decease.

The testimony of the witness called by the parties contesting the application of appellant and others (respondents) did not establish, or tend to establish, that the word " advancements " was used to designate or include any subsequent legacy to appellant. The witness said: —

" I was about two months in draughting said will, as the doctor [testator] made frequent changes, and I had to rewrite it. It took him a long time to make up his mind about some of his property. When he came to the matter of these German heirs, he seemed already prepared. The one thousand shares of the capital stock of the Bank of California he designed for them; and he proceeded to divide it up just as it is written in the will, four families, each one quarter.

"After I had written and read it to him, he remarked that when he arrived in Germany he intended to give some money to such of his relatives there as might need it, to distribute some money among them, and whatever that amount might be to either of them, must come out of their share of the proceeds of the bank stock. It was under that instruction that that clause was framed. The will was not signed when completed. He kept it a couple of days examining it, but made no remarks to me that I remember. He made the statement about the German heirs. He seemed to be prepared, and settled it as above stated. Before the will was executed he wanted Judge Heydenfeldt to read the will. He came and read it. Judge Heydenfeldt said it was all right. I am under the impression the doctor used the word "distribute" in reference to the German heirs. He said: 'Distribute some money among these people.'"

The statement of decedent to witness, that "when he arrived from Germany" he intended "to give" or "distribute" some money to or among such of his relatives there as might need it, accords at least as well with a purpose to make presents to such relatives personally as with an intention to make different and substitutionary testamentary provision for such of them as he had named in his will. It is significant that in terms he expressed no intention of providing for his relatives in Germany by supplemental will or codicil. There is no suggestion in the testimony of Taft that deceased entertained such intention. It cannot be derived from the word "distribute," a word appropriately applicable to an allotment or division of money among the German relatives by the testator in his lifetime.

Our conclusion is, that when the California will was made and published, the deceased intended that the legacies mentioned in item 6 should be reduced only by actual payments made by himself personally; that is, in his lifetime.

The evidence shows that the decedent took with him when he left for Europe about thirty-five thousand dollars, and that he afterward wrote for, and there was sent him by his agent, the witness Taft, one hundred and twenty-five thousand dollars. Decedent wrote for the last sum at Nice, December 22, 1883, but in his letter stated that he had already directed his agent to send him "every two or three months all the cash on hand."

The court below found that Taft, testator's agent, sent the one hundred and twenty-five thousand dollars from San Francisco on the sixteenth day of January, 1884, and that on the 23d of the same month he sent another sum of five thousand dollars. When the California will was made and published, the testator intended that any sum of money he might personally give to the persons named in item 6 should be deducted from the legacy to such persons. His language proves, at least, that he then contemplated the probability of such advances. Neither the fact that the decedent caused very large sums of money to be placed in Europe, nor his letter of December 22, 1883, indicates any change of his original purpose to make gifts or advances personally to some of those mentioned in item 6.

Can we say his intention was changed or modified prior to the making of the Rottweil will?

"Although two bequests may be made to the same person, and although these bequests may differ in their amounts, incidents, and forms, . . . . still the special language used by the testator in making the second gift, or the language *found in other parts* of the will, may sufficiently show his intention to give the second legacy for or in satisfaction of the prior one. . . . . It is impossible to lay down any general rule governing such cases; each case must stand upon its own circumstances. The question is, then, simply one of interpretation in order to ascertain the real intent of the testator. But in arriving at this intent, the court will if necessary look

at all parts of the will. The court may also be called upon to interpret the testamentary language rather than to apply any rule of presumption when the second instrument,—e. g., the codicil—*expressly refers to the former one.* The terms of the second instrument—perhaps codicil— may be such, *when all taken together,* as to show an intent that the second gift was to be in substitution or in satisfaction, and not cumulative." (1 Pomeroy's Eq. Jur., sec. 548.)

Paragraph 1 of the Rottweil will reads: "I have already disposed by testament of my estate in California. That testamentary disposition shall remain unchanged, and I again ratify the same." And in paragraph 7, the testator confirms all bequests which he had already made, and declares that any testamentary papers subscribed by him shall have the same effect " as if they were here incorporated."

The two instruments are therefore to be read as one writing; the whole expressing the intent of the testator at the date of the Rottweil will,—so far as his intent appears from the writing,—with regard to the disposition of his property.

There may be some significance in the circumstance that, after a large amount of money had been sent to him, which he might, perhaps, have given to or distributed among his relations " personally," the testator did not make such personal donations, but proceeded to prepare a codicil wherein he inserted bequests to some of the persons named in item 6. This fact, however, if it can be considered at all, should have little weight in any inquiry the purpose of which is to ascertain whether the testator then, at Rottweil, intended that the term " advancements " should include the second legacies. The suggestion is but conjectural that he may have meant what his language does not imply. It is as easy to suppose the testator changed his mind, and decided to give to some of those named in item 6

further and cumulative bequests out of the moneys sent to Europe, as that he determined such further bequests should be treated as " advancements."

· We may conjecture that finding himself growing more ill, his decease perhaps imminent, and believing he would not be able " personally" to distribute the moneys, he concluded to make the *advancements* by new bequests. On the other hand, we may conjecture that, returning after long absence to companionship with some of his earlier friends, to whom he was connected by the ties of kindred, his surroundings recalling in his old age the home of his childhood, and all its endearing associations, he may have decided to make provision for some of his relatives in addition to that made by the California will. But all such surmises are more or less fanciful, since they are not based upon the language of the instruments, and are built on presumptions rather than evidence,— presumptions of facts from which different inferences may be drawn, as prominence is given to some or the other of them.

By paragraph 7 of the Rottweil will the California will is to be treated as " incorporated " in the former.   Item 6 of the California will contains the provision: "Any advancement that I may hereafter personally make [to the legatees named in the item] shall be deemed a partial satisfaction," etc.   Not only did the testator fail to declare, in express term in the Rottweil will, that the legacies therein given to those named in item 6, should satisfy, in whole or in part, the former bequests, but it may have said he reaffirmed his desire that those bequests should be reduced only by advancements he might " *hereafter* personally make."   The force of this suggestion is, however, by no means conclusive.   When it is said that the two instruments are to be read as one, it is not to be assumed that literal effect is to be given to every clause of both. This may not be possible without violating the reasonable rules of interpretation applicable to every writing.   If it

satisfactorily appear—from other portions of the wills—
that the Rottweil legacies were intended to satisfy, fully
or *pro tanto*, those given in item 6, the provision in that
item as to advancements may be disregarded; or the
language used at Rottweil, read with the first will, may
show that—whatever its meaning disconnected from the
Rottweil will—the testator, at the time the Rottweil will
was made, intended the word " advancements " to cover
the Rottweil legacies.

In paragraph 1 of the will or codicil made at Rottweil
the testator declares: " I have already disposed by testa-
ment of my estate in California. That testamentary dis-
position shall remain unchanged, and I again ratify the
same." The bank stock was part of the estate in Cali-
fornia, and so far as appears on the face of the instru-
ment, the whole purport and intent of the Rottweil will
was to make disposition of the moneys he had arranged
to have sent to " Germany or Wurtemburg." In para-
graph 2, immediately after ratifying the disposition of
the California will, the testator says: " However, I have
already made arrangements to have a sum of money sent
from California to a bank in Germany or Wurtemburg,
of which I shall dispose in favor of other relatives. The
following sums of money shall be paid." He then pro-
ceeds to bequeath sums to relatives residing in Germany,
some of whom were given legacies by item 6 from his
" estate in California," and some of whom were not men-
tioned in the California will.

We find nothing to indicate that the legacies given
to such of the donees as were mentioned in item 6
were not to be additional or cumulative unless it be in
the expression " of which I shall dispose in favor of
*other relatives*." Now, the sums given by the testamentary
instrument executed at Rottweil to Mathilde Zeile, testa-
tor's sister, and to his niece, the appellant, were given
absolutely. Whether they were intended as " advance-
ments " or not, the right to them (subject to administra-

tion) vested unconditionally on the death of Frederick Zeile, except so far as the rights of those named in item 6 of the California will might be limited by the happening of the unexpected contingency spoken of in paragraph 4 of the Rottweil will. Whenever the second legacy is regarded as substitutionary and not as cumulative, the satisfaction of the prior legacy — to the extent of the second — is absolute; the former legacy — to that extent — creating no right in the legatee, there is no claim of an election between the two on his part.

When, therefore, the testator proposed to dispose of the moneys sent to Europe to " other relatives," he could not have intended to exclude from his bounty those to whom it was expressly extended. Yet some of those to whom legacies were given by the Rottweil will were not named in item 6 of the California will. Those were the *other* relatives, and the clause can only be read as intended to give legacies, from the sums sent to Europe, as well as to those to whom donations were made by item 6 as to the " other relatives " mentioned.

In paragraph 4 of the Rottweil instrument the testator provided for an event which he regarded as possible, although not probable, and which never came to pass. If, unexpectedly, the funds in Germany should be insufficient to pay the sums in paragraph 2, the heirs of the estate in California were to make up the deficiency. In paragraph 5 he applied the word " heirs " to legatees. But if in paragraph 4 he intended to include in the word " heirs " all the devisees and legatees named in the California will, there is nothing in the language which indicates his purpose that the bequest in paragraph 2, or the residuary interests given by the Rottweil instrument, should be " advancements" in satisfaction of the legacies of the item 6 of the California will.

Starting, then, with the presumption that the second legacy to appellant was intended to be cumulative, unless the language used by the testator shows it was to be

in substitution, does the language of the testator overcome this presumption? As we have attempted to show, the term "advancements" does not of itself, either in its technical or in any popular sense, cover a subsequent legacy; and after a careful examination of the language of the two instruments published at Rottweil, we have been unable to discover therein an intention upon the part of the testator that the word should bear such peculiar signification as that its scope should include the Rottweil legacies, or any intention that those legacies should satisfy, in whole or in part, the bequests of the proceeds of the bank stock.

Judgment and order reversed, and a new trial granted to appellant Marie M. Hummel.

TEMPLE, J., and PATERSON, J. concurred.

Hearing in Bank denied.