[No. F061052. Fifth Dist. Feb. 27, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE CONTRERAS CASAREZ, Defendant and Appellant.

1174

**COUNSEL**

Karli Sager, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

KANE, J.—Defendant Jose Contreras Casarez was convicted of falsely impersonating his brother during a traffic stop. On appeal, he contends (1) insufficient evidence supported the conviction for false personation, (2) a more specific criminal statute precluded his conviction, (3) the trial court erred in failing to instruct on the lesser included offense of attempted false personation, (4) the trial court abused its discretion by refusing to reduce the offense to a misdemeanor, and (5) the trial court denied defendant's constitutional rights by failing to hold a hearing to determine his competency. We will reverse.

## PROCEDURAL SUMMARY

On March 18, 2010, the Tulare County District Attorney charged defendant with false personation (Pen. Code, § 529, former subd. 2;[1] count 1). The information further alleged that defendant had suffered a prior felony conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), had served three prior prison terms (§ 667.5, subd. (b)), and was ineligible for probation (§ 1203, subd. (e)(4)).

On May 25, 2010, a jury found defendant guilty as charged. Defendant admitted the special allegations.

The court denied probation and sentenced defendant to five years in prison: the middle term of four years (two years doubled pursuant to § 667, subd. (e)(1)), plus one year, to be served consecutively for a prior prison term enhancement. The remaining two prior prison term enhancements were dismissed in the interest of justice.

## FACTS

On March 3, 2010, Officers Whaley and Verissimo conducted a traffic stop. Verissimo noticed defendant in the backseat of the car. A warrant was out for defendant's arrest, and Whaley and Verissimo had both received a wanted-person flyer containing defendant's photograph and identifying information, including a description of his tattoos. When Verissimo noticed the tattoos on defendant's hands, it jogged his memory and he recognized him. Verissimo asked defendant what his name was. Defendant said his name was Tony Contreras. Verissimo did not believe him, so he asked if he would step out of the car so they could talk. Defendant said, "Fine," and he stepped out. As he

---

[1] All statutory references are to the Penal Code unless otherwise noted.

All further references to section 529 are to the version in effect in 2010. (Stats. 1983, ch. 1092, § 296, p. 4050.)

was doing so, Verissimo asked him if he possessed anything illegal or dangerous, and he said he did not. Verissimo asked if he could search him, and defendant said, "Go ahead." As Verissimo patted down defendant, Verissimo pulled out a folded piece of white paper from defendant's back pocket. Without unfolding it, Verissimo set it on the roof of the car. Defendant said either, "It's a birth certificate that will identify me as Tony Contreras," or "That's my birth certificate. That proves who I am." When Verissimo looked at the paper, he saw it was a Tulare County birth certificate in the name of Tony Contreras. It appeared to be valid.

Whaley contacted an officer who confirmed defendant's identity based on his distinctive tattoos. At this point, Whaley took defendant into custody. After defendant was read his *Miranda*[2] rights, he agreed to talk to Whaley. Defendant said the birth certificate was his brother's. He had taken it from his mother's bedroom without her knowledge because he had an active warrant and he knew his brother did not. He said he was carrying it so he could show it to law enforcement and pass himself off as his brother to avoid being apprehended on his active warrant.

Verissimo testified that he sometimes relied on birth certificates as proof of identity during traffic stops because they contain a name and a birth date, which are tools in identifying the person, allowing the officer to investigate further for a photograph or other identifying information, such as tattoo descriptions.

Whaley testified that he too had used birth certificates as identifying documents. The name and birth date provide identifying information. Whaley would use other tools in addition to the birth certificate to identify a person. When a person gives his name, his production of a birth certificate makes his assertion of the name more credible.

## DISCUSSION

Defendant contends the evidence did not support his conviction under section 529, former subdivision 2, because there was insufficient evidence he committed an additional act beyond falsely identifying himself to the officer. We agree.

I.  *Standard of Review*

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 553 [127 Cal.Rptr.2d 802, 58 P.3d 931].) We must draw all reasonable inferences in support of the judgment. (*People v. Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80].) "It is not our function to reweigh the evidence, reappraise the credibility of witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955 [60 Cal.Rptr.3d 534]; see *People v. Young* (2005) 34 Cal.4th 1149, 1181 [24 Cal.Rptr.3d 112, 105 P.3d 487].)

## II. *Section 529*

■ Under section 529, it is either a misdemeanor or a felony to falsely impersonate another person and, while doing so, commit an additional act.[3] "The additional act required by section 529 is something beyond, or compounding, the initial false personation . . . ; it must be more than simply providing information regarding the false identity. [Citations.]" (*People v. Stacy* (2010) 183 Cal.App.4th 1229, 1235 [108 Cal.Rptr.3d 312].) The additional act may be one of three types, as the statute provided: "Every person who falsely personates another in either his private or official capacity, and in such assumed character either: [¶] 1. Becomes bail or surety for any party in any proceeding whatever, before any court or officer authorized to take such bail or surety; [¶] 2. Verifies, publishes, acknowledges, or proves, in the name of another person, any written instrument, with intent that the same may be recorded, delivered, or used as true; or, [¶] 3. Does any other act whereby, if done by the person falsely personated, he might, in any event, become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture, or penalty, or whereby any benefit might accrue to the party personating, or to any other person; [¶] Is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment." (Former § 529.)

## III. *Former Subdivision 3*

■ It appears that most cases brought under section 529 were based on former subdivision 3, which provided, in essence, that the additional act beyond the impersonation could be any act that might impose liability on the impersonated person or confer benefit on the impersonator. In cases where the impersonation occurred before a law enforcement officer, section 148.9 was often raised because it punishes falsely identifying oneself to an officer during a

---

[3] We use the terms "personate" and "impersonate" interchangeably.

lawful detention to evade proper identification.[4] And, unlike section 529, it is strictly a misdemeanor. Thus, "[t]here necessarily must be something to distinguish an act punishable as a felony under section 529 from an act punishable as a misdemeanor under section 148.9." (*People v. Cole* (1994) 23 Cal.App.4th 1672, 1676 [28 Cal.Rptr.2d 788] (*Cole*).) The following cases illustrate.

In *Cole*, the defendant contended he had not committed an additional act that would elevate his crime from a violation of section 148.9 to a violation of section 529, former subdivision 3. While sitting in the patrol vehicle following his arrest, the defendant orally identified himself to the arresting officer as Larry Quesenberry and provided Quesenberry's birth date. The officer asked the defendant if his middle name was Ray, which was Quesenberry's middle name, and the defendant replied affirmatively. (*Cole, supra*, 23 Cal.App.4th at p. 1674.) The People argued that, by providing additional information beyond a false name (the birth date and middle name), the defendant committed the necessary additional act and elevated the crime from a misdemeanor under section 148.9 to a felony under section 529. (*Cole, supra*, at p. 1676.) This court disagreed, explaining that these additional acts of giving a birth date and a middle name were "*no more than part of the act of providing the false information upon which the false identity was based.* Each statement made in the course of providing contemporaneous statements amounting to false identification logically cannot be construed as separate acts compounding each prior statement." (*Ibid.*, italics added.) Finding insufficient evidence of an additional act, we concluded that the record did not support the felony conviction, but did support the misdemeanor conviction. Therefore, we reversed the conviction and directed the trial court to enter a judgment of conviction for a violation of section 148.9 on remand. (*Cole, supra*, at pp. 1676–1677, 1679.)

In *People v. Chardon* (1999) 77 Cal.App.4th 205 [91 Cal.Rptr.2d 438], the defendant, who was convicted under section 529, also contended she had not committed the necessary additional act required by section 529, former subdivision 3. When she was stopped for speeding, she orally identified herself as Michelle Chardon, her sister. She also provided Michelle's middle name and birth date. She claimed she did not have her driver's license or any registration information. The officer went to his vehicle and ran a license check with Michelle's information, which revealed that Michelle had a valid license with no holds or warrants. The officer wrote up a citation in

---

[4] Section 148.9 provides, in relevant part: "(a) Any person who falsely represents or identifies himself or herself as another person or as a fictitious person to any peace officer . . . upon a lawful detention or arrest of the person, either to evade the process of the court, or to evade the proper identification of the person by the investigating officer is guilty of a misdemeanor."

Michelle's name, and the defendant signed Michelle's name on the citation's promise to appear. The court held that this additional act "exposed her sister not only to liability for the citation but also to potential criminal liability for failing to appear at the scheduled hearing." (*People v. Chardon, supra*, at p. 212.) The court noted there is no requirement that the additional act occur on a separate occasion, only that there *be* such an act. (*Id.* at pp. 212–213.) The court distinguished the facts from those in *Cole*, as follows: "Unlike the defendant in *Cole* who simply orally identified himself to the officer by providing first, last and middle names and a birthdate, defendant here engaged in an *additional* act of false personation which exposed her sister to further criminal liability." (*Id.* at p. 212.)

In *People v. Stacy, supra*, 183 Cal.App.4th 1229, the defendant was stopped for a traffic offense. She told the officer she did not have her driver's license, but she orally identified herself as Amber Skrobecky, her cousin, and provided an incorrect birth date (even for Skrobecky). The defendant performed field sobriety tests and was found to be intoxicated. During the drive to the jail, she gave the officer Skrobecky's correct driver's license number and mailing address, but an incorrect middle name. The officer asked her maiden name, and she gave one that did not match either maiden name listed for Skrobecky. The officer confronted the defendant with the discrepancies, but she insisted she was Skrobecky and offered another incorrect birth date. At the jail, she was fingerprinted. She took one breathalyzer test, but refused to complete the mandatory second test and to provide a blood sample. When the fingerprint results revealed her true identity, she admitted she had lied about her identity because there were outstanding warrants for her arrest. (*Id.* at pp. 1231–1233.)

On appeal, the defendant contended there was insufficient evidence she committed an act beyond falsely identifying herself that subjected Skrobecky to potential liability. She argued that the only additional act she committed was performing the field sobriety test, which was not criminal. But the court stated that she also refused to complete the mandatory second breath test and did not consent to having her blood drawn. "Her refusal to complete the chemical testing, while acting as Amber Skrobecky, put Skrobecky at risk of liability for refusing to submit to and/or complete the chemical testing requirements under Vehicle Code sections 23612 and 23577. Indeed, such charges were ultimately levied against [the] defendant when her true identity was learned." (*People v. Stacy, supra*, 183 Cal.App.4th at pp. 1235–1236, fn. omitted.) The evidence was sufficient to satisfy section 529, former subdivision 3. (*People v. Stacy, supra*, at p. 1237.)

IV. *Former Subdivision 2*

■ The present case was brought under former subdivision 2 of section 529, which applied when the additional act beyond the impersonation is "[v]erif[ying], publish[ing], acknowledg[ing], or prov[ing], in the name of another person, any written instrument, with intent that the same may be recorded, delivered, or used as true." It is this additional act that defendant claims was not proved in this case. At trial, the prosecutor argued that when defendant told the officer the birth certificate was his and it would prove he was Tony Contreras, he was *verifying and acknowledging* that the document was his. On appeal, the People argue that defendant *published* his brother's birth certificate with the intent that it be *used as true*. As we will explain, we conclude former subdivision 2 was not intended to punish this type of act.

■ "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' [Citations.]" (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].) "It is a generally accepted principle that in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing upon them." (*Buckley v. Chadwick* (1955) 45 Cal.2d 183, 200 [289 P.2d 242], fn. omitted; see *Security Pacific Nat. Bank v. Casavant* (1988) 205 Cal.App.3d 127, 131 [252 Cal.Rptr. 175] [we assume the Legislature had previous statutes in mind when it enacted a newer statute].) **(5)** " '[T]he "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a measure comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.' [Citation.] [¶] The language is construed in the context of the statute as a whole and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose. [Citation.]' [Citations.] The intent of the law prevails over the letter of the law, and ' "the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.]' [Citation.]" (*People v. Canty* (2004) 32 Cal.4th 1266, 1276–1277 [14 Cal.Rptr.3d 1, 90 P.3d 1168].)

"The statutory language [of section 529] first appeared in the Statutes of 1850, chapter 99, section 90, page 241, apparently having been derived from the New York Revised Statutes of 1828 (2 N.Y. Rev. Stats. (1828) § 48, p. 676). The California Legislature codified section 529 in 1872 and has not changed it in any relevant respect since that time. Unsurprisingly, given the antiquity of the statute, there is no available legislative history to assist us in its interpretation." (*People v. Rathert* (2000) 24 Cal.4th 200, 204 [99 Cal.Rptr.2d 779, 6 P.3d 700].)

Section 529 is found in chapter 8, entitled "False Personation and Cheats," which is contained in part 1, title 13 of the Penal Code (chapter 8), entitled "Of Crimes Against Property." "A purview of Chapter 8's provisions indicates that the essence of these provisions is to punish the type of fraud perpetrated by means of impersonation of another person." (*People v. Robertson* (1990) 223 Cal.App.3d 1277, 1282 [273 Cal.Rptr. 209], abrogated on another ground in *People v. Rathert, supra,* 24 Cal.4th at pp. 206–208.) On its enactment in 1872, chapter 8 included sections 528 (marriage under false personation), 529 (false personation of another in private or official capacity; bail or surety; verification, publication, or acknowledgment of instrument; acts imposing liability or conferring benefit), 530 (false personation of another in private or official capacity; obtaining money or property), 531 (fraudulent conveyances; defense of conveyance by party; sale or assignment of property conveyed), 532 (false pretenses; obtaining money, labor or property), 533 (real estate; multiple sales of same parcel), 534 (real estate; sales by married person under false representation), and 535 (mock auctions; obtaining money, property or signature).

█ Chapter 8 continues to include these sections, plus more recent additions addressing, among other things, false birth certificates and driver's licenses, identity theft and use of personal identifying information, and various other types of fraud and impersonation. (See §§ 528–539.) Section 529a, which was added in 1979 (Stats. 1979, ch. 739, § 2, pp. 2584–2585) and might be applicable to this case, punishes the production, sale, possession, and use of a false or counterfeit birth certificate. It provides: "Every person who manufactures, produces, sells, offers, or transfers to another any document purporting to be either a certificate of birth or certificate of baptism, knowing such document to be false or counterfeit and with the intent to deceive, is guilty of a crime, and upon conviction therefor, shall be punished by imprisonment in a county jail not to exceed one year, or by imprisonment pursuant to subdivision (h) of Section 1170. *Every person who offers, displays, or has in his or her possession* any false or counterfeit certificate of birth or certificate of baptism, or *any genuine certificate of birth which describes a person then living or deceased, with intent to represent himself or herself as another or to conceal his or her true identity, is guilty of a crime,*

*and upon conviction therefor, shall be punished by imprisonment in the county jail not to exceed one year."* (Italics added.)

Chapter 8 also now includes section 529.5, added the same year as section 529a (Stats. 1979, ch. 717, § 2, p. 2205), which punishes the production, sale, and possession of a fake driver's license, and section 529.7, added in 2002 (Stats. 2002, ch. 907, § 2, p. 5619), which punishes the obtaining or possession of an official driver's license by someone not entitled to possess it.

## V. *Required Acts*

The plain language of former subdivision 2 of section 529 addressed specific acts made with a written instrument. To describe the acts, the statute used traditional legal terms with specific meanings in the context of written instruments. According to Black's Law Dictionary, a written "instrument" is "[a] formal or legal document in writing, such as a contract, deed, will, bond, or lease. A writing that satisfies the requisites of negotiability . . . . A negotiable instrument . . . , or a security . . . or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." (Black's Law Dict. (6th ed. 1990) p. 801, citations omitted.) In 1880, the Supreme Court explained that the word "instrument," as used in the Civil Code, "invariably . . . indicate[d] some written paper or instrument signed and delivered by one person to another, transferring the title to or creating a lien on property, or giving a right to a debt or duty." (*Hoag v. Howard* (1880) 55 Cal. 564, 565.) Several years later, the court stated: "The term 'instrument,' in its broad sense, includes formal or legal documents in writing, including contracts, deeds, wills, bonds, leases, mortgages, etc." (*Cardenas v. Miller* (1895) 108 Cal. 250, 256 [41 P. 472].) We will assume, for the sake of argument, that an official birth certificate constitutes a written instrument.[5]

As for the acts themselves, we consider the plain meaning of the terms in the context of written instruments. To "verify" is "[t]o confirm or substantiate by oath or affidavit. Particularly used of making formal oath to accounts, petitions, pleadings, and other papers. . . . [W]hen used in a statute, ordinarily

---

[5] But see *People v. Fraser* (1913) 23 Cal.App. 82, 84–85 [137 P. 276] (a birth certificate is not an instrument under § 115). *Fraser,* however, was criticized as narrowly construed to apply mostly to real property documents (e.g., *Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 682–684 [165 Cal.Rptr. 222] [*Fraser* distorted the sense of language in *Hoag v. Howard, supra,* 55 Cal. 564, and misconstrued the meaning of "instrument"]; *People v. Powers* (2004) 117 Cal.App.4th 291, 295–296 [11 Cal.Rptr.3d 619] [*Fraser* overlooked broader meaning of "instrument"; for example, a will has always been regarded as an instrument, even under § 115]).

imports a verity attested by the sanctity of an oath." (Black's Law Dict., *supra*, at p. 1561.) In 1873, the Supreme Court explained: "It is the signature which verifies the instrument and not the writing in the body of it, and if the signature be genuine and the writing in the body of the paper in the usual form, though in a different handwriting from that usually employed, there will be nothing in the latter circumstance to excite the slightest suspicion of fraud." (*Redington v. Woods* (1873) 45 Cal. 406, 422–423.) "The term 'verified' wherever used in the Code of Civil Procedure of this state requires the oath or affidavit of the party executing the instrument in order to amount to a sufficient verification thereof . . . ." (*Pasqualetti v. Hilson* (1919) 43 Cal.App. 718, 720 [185 P. 693] [particular statute required that the document be " 'verified by anyone having knowledge of the facts' "; mere acknowledgment of the execution of document by the person signing it would not amount to a verification thereof].)

To "acknowledge" is "[t]o own, avow, or admit; to confess; to recognize one's acts, and assume the responsibility therefor." (Black's Law Dict., *supra*, at p. 23.) An acknowledgment of a written instrument is a "[f]ormal declaration before authorized official, by person who executed instrument, that it is his free act and deed." (*Ibid.*) "A notary's official duties include taking the acknowledgment of deeds, verifying the identity of signatories, and collecting their signatures in a journal. [Citations.]" (*Purdum v. Holmes* (2010) 187 Cal.App.4th 916, 923–924 [115 Cal.Rptr.3d 21]; see *Pitney v. Pitney* (1921) 55 Cal.App. 22, 31 [202 P. 940] ["the plaintiff had placed her mark at the end of the deed and her name was written thereon by Mr. Witherspoon, and thereafter the plaintiff turned to . . . a notary public and acknowledged to him that she executed that paper . . ."].) "The officer taking an acknowledgment is required . . . to certify to three factors: [¶] First, that the declarant personally appeared before him; secondly, that the declarant was known to him to be the person whose name is subscribed [(i.e., signed)] to the declaration, and thirdly, that the declarant acknowledged that he executed the document." (*Favello v. Bank of America etc. Assn.* (1938) 24 Cal.App.2d 342, 344–345 [74 P.2d 1057].) "The provisions relating to the acknowledgment of deeds are made for the protection and security of creditors and purchasers." (*Kimbro v. Kimbro* (1926) 199 Cal. 344, 349 [249 P. 180].)

To "prove" is "[t]o establish or make certain; to establish a fact or hypothesis as true by satisfactory and sufficient evidence." (Black's Law Dict., *supra*, at p. 1224.) Enacted in 1872, Civil Code section 1195 provided: "Proof of the execution of an instrument, when not acknowledged, may be made either: [¶] 1. By the party executing it, or either of them; or, [¶] 2. By a subscribing witness; or, [¶] 3. By other witnesses, in cases mentioned in

section eleven hundred and ninety-eight."[6] In 1872, Civil Code section 1180 stated: "The proof or acknowledgment of an instrument may be made at any place within this State before a Justice or Clerk of the Supreme Court."[7] According to the more recent Government Code section 8205, it is the duty of a notary public, when requested, "[t]o take the acknowledgment or proof of advance health care directives, powers of attorney, mortgages, deeds, grants, transfers, and other instruments of writing executed by any person, and to give a certificate of that proof or acknowledgment, endorsed on or attached to the instrument." (Gov. Code, § 8205, subd. (a)(2).)

To "publish" is "[t]o make public; to circulate; to make known to people in general. To issue; to put into circulation. To utter; to present (*e.g.* a forged instrument) for payment. To declare or assert, directly or indirectly, by words or actions, that a forged instrument is genuine. An advising of the public or making known of something to the public for a purpose." (Black's Law Dict., *supra*, at p. 1233.) Certain written instruments, such as wills, are considered to be published. (See, e.g., *Estate of Margaretha Pfuelb* (1874) 48 Cal. 643 ["In the year 1869 the testatrix made and published her last will and testament, by which she bequeathed to a son of her deceased husband, by a former wife, the sum of four thousand dollars."]; *In re Zeile* (1887) 74 Cal. 125, 127 [15 P. 455] ["He left a will, executed and published in this state on the 19th of May, 1883, which was duly probated in San Francisco . . . ."]; *Estate of Bartholomae* (1968) 261 Cal.App.2d 839, 841 [68 Cal.Rptr. 332] ["The jury returned special verdicts that the will was not executed or published as the result of fraud or undue influence . . . ."].)

## VI. *Required Intent*

According to the plain language of the statute, the impersonator must commit one of these acts with a written instrument, described above, with the intent that the written instrument may be recorded, delivered, or used as true.

To "record" is to "enter the history of an act or series of acts, in an official volume, for the purpose of giving notice of the same, of furnishing authentic evidence, and for preservation." (Black's Law Dict., *supra*, at p. 1273.) Deeds and various other types of instruments can be recorded. (See Miller &

---

[6] Civil Code section 1195, subdivision (b)(1) now additionally states: "Proof of the execution of a power of attorney, grant deed, mortgage, deed of trust, quitclaim deed, or security agreement is not permitted pursuant to Section 27287 of the Government Code, though proof of the execution of a trustee's deed or deed of reconveyance is permitted."

[7] Civil Code section 1180 now states: "The proof or acknowledgment of an instrument may be made at any place within this state before a justice, retired justice, or clerk of the Supreme Court, a justice, retired justice, or clerk of any court of appeal or judge or retired judge of a superior court, or the Secretary of the Senate or Chief Clerk of the Assembly."

Starr, Cal. Real Estate (3d ed. 2009) § 11:6, pp. 11-24 to 11-49 [listing 152 recordable instruments].) In 1872, Civil Code section 1169 provided, and still provides, that "[i]nstruments entitled to be recorded must be recorded by the County Recorder of the county in which the real property affected thereby is situated." In 1872, Civil Code section 1170 provided: "An instrument is recorded when duly acknowledged or proved, certified, and deposited in the Recorder's office with the proper officer, and by him filed for record, by noting thereon such filing, with the minute, hour, day, and year thereof, and subscribing the same."[8]

To "deliver" is to place "the res or substance thereof . . . within the actual or constructive possession or control of another. [¶] . . . [¶] . . . Delivery with respect to instruments, documents of title, chattel paper or securities means voluntary transfer of possession. . . . [¶] The act by which seller parts with possession and buyer acquires possession." (Black's Law Dict., *supra*, at p. 428, citation omitted.) Enacted in 1872, Civil Code section 1054 still states: "A grant takes effect, so as to vest the interest intended to be transferred, only upon its delivery by the grantor." " 'Delivery' is a word of well-defined meaning in the law. It is the act, however evidenced, by which the instrument takes effect and title thereby passes." (*Williams v. Kidd* (1915) 170 Cal. 631, 649 [151 P. 1].)

To "use" is "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end." (Black's Law Dict., *supra*, at p. 1541.)

## VII. *Case Law*

While section 529, former subdivision 3 appears relatively frequently in case law, section 529, former subdivision 2 rarely appears, even in nonpublished cases. But not long after the statute's 1872 inception, the Supreme Court addressed former subdivision 2 in *People v. Maurin* (1888) 77 Cal. 436 [19 P. 832]. The defendant was convicted under former subdivision 2 of section 529, and "[t]he particular charge in the information was, that the defendant falsely *personated* one Dr. F. F. De Derky, and in such *assumed character*, verified, etc., a certain certificate of death, with intent that it should be recorded, etc." (*Maurin, supra*, at p. 437.) The evidence was insufficient to prove that the defendant signed the death certificate while under the assumed identity of the doctor. (*Id.* at pp. 437–438.) The court explained: "The most that the jury could have found against the defendant,

---

[8] Civil Code section 1170 now states: "An instrument is deemed to be recorded when, being duly acknowledged or proved and certified, it is deposited in the Recorder's office, with the proper officer, for record."

under any view of the evidence, was, that he signed De Derky's name to the certificate without authority to do so, and without any reason to honestly believe that he had such authority. And they must have concluded that signing the certificate without such authority constituted the crime charged in the information. But there was no evidence that he *personated* Dr. De Derky, or pretended to any human being that he, the defendant, *was* Dr. De Derky. He certainly made no such pretension . . . . If he signed the certificate without any authority, and fraudulently wrote De Derky's name when he knew that he had no right to do it, he may have been guilty of forgery . . . . To personate another person is to assume to be that person." (*Id.* at p. 439.)

Several years later, an Oklahoma court in *Raymer v. State* (1924) 27 Okla.Crim. 398 [228 P. 500], addressed an analogous statute, which provided: " 'Any person who falsely personates another, and in such assumed character, either: *** [¶] Third, subscribes, verifies, publishes, acknowledges, or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true. ***' " (*Id.*, 228 P. at p. 501.)[9] The court explained: "To commit a crime under this statute, the defendant must personate *another person* by subscribing, verifying, or publishing a written instrument *which purports to be the writing of that other person.*" (*Raymer, supra*, at p. 501, italics added.) The information charged that the defendant " 'did then and there willfully, unlawfully, feloniously, and falsely subscribe, publish, and mail to W. L. Foster, at Griggs, Oklahoma, a written instrument, to wit, a letter, and he, the [defendant], falsely subscribing the name "Ku Klux Klansman" to said letter, with the intent that the said letter should be delivered and the signature thereon taken as true, when he, [the defendant], well knew that he was not a "Ku Klux Klansman" nor a member of the 'Ku Klux Klan'; the [defendant] thereby falsely assuming the character of the "Ku Klux Klan." ' " (*Id.* at p. 502.) The evidence, however, showed the following: "[The defendant], an old man about 70 years old, who could neither read nor write . . . procured a public stenographer to write for him several letters to different parties, to which the words 'Ku Klux Klansman' were subscribed thereto. [The defendant] took these letters and they were subsequently received through the mail by the parties to whom they were addressed. The public stenographer testified that [the defendant] told her his [real] name . . . , and that he did not represent himself to be a 'Klansman,' but said that he was a member of some committee that was to send out the letters. This evidence, together with the fact of the receipt of the letters and of the introduction of the letters themselves, was the evidence upon which this conviction was based. These facts do not constitute a false personation within the meaning of section 2140, supra. *People v. Maurin*[, *supra*,] 77 Cal. 436 . . . . [¶] The confession of error is sustained. The proper procedure would have been to

---

[9] To "subscribe," which is not mentioned in section 529, is "[t]o sign at the end of a document." (Black's Law Dict., *supra*, at p. 1427.)

have put this ignorant old man under a peace bond, or else to have turned him over to the federal authorities for a prosecution for sending threatening letters through the mail. The conviction here is based on a misconception of the law." (*Ibid.*) The court concluded that the evidence was insufficient. (*Id.* at p. 501.)

About 76 years later, in *Lee v. Superior Court* (2000) 22 Cal.4th 41 [91 Cal.Rptr.2d 509, 989 P.2d 1277] (*Lee*), our Supreme Court discussed the purpose of former section 529 in the context of impersonation of a deceased person. The court explained: "[S]tatutes prohibiting impersonation have two purposes. One is to prevent harm to the person falsely represented; the second is to ensure the integrity of judicial and governmental processes. Both purposes are furthered by construing section 529 as applying to impersonation of a deceased person as well as of a living person, and both would be frustrated by a contrary interpretation of the statute. [¶] Regarding the first purpose of such statutes—protecting the impersonated—it is instructive to consider the whole of section 529. In addition to the conduct described in subdivision 3, which is at issue in this matter, the statute also covers impersonation of another 'in either his private or official capacity' in a situation in which the defendant '1. Becomes bail or surety for any party in any proceeding whatever, before any court or officer authorized to take such bail or surety'; or '2. Verifies, publishes, acknowledges, or proves, in the name of another person, any written instrument, with intent that the same may be recorded, delivered, or used as true . . . .' [¶] Viewed together, the substance of the three subdivisions that comprise section 529 demonstrate a legislative intent to include, rather than exclude, impersonation of the deceased. *This is perhaps most clear with regard to subdivision 2 of the statute, which the Legislature likely intended would apply to impersonation of a deceased person, in order, for example, to protect a deceased person's interests during the period between death and the settling of his or her estate.*" (*Lee, supra,* at pp. 45–46, fn. omitted, italics added.) "Our conclusion in this regard is confirmed by consideration of the history and context of a companion statute—section 530—that was enacted with section 529 in 1872, and that was amended with section 529 in 1905 to add the 'private or official capacity' clause. (Stats. 1905, ch. 523, §§ 1, 2, pp. 684, 685.) Section 530 makes it a crime to 'personate[] another, in either his private or official capacity, and in such assumed character receive[] any money or property, knowing that it is intended to be delivered to the individual so personated' with the intent to keep the money or property for the defendant's own use. As noted above with regard to section 529, subdivision 2, there is no reason to believe that the Legislature intended that section 530 would not be triggered by imperson-ation of the deceased, and indeed it seems most reasonable to assume that the Legislature intended that the section would apply in such situations in order to protect the interests of the individual impersonated." (*Id.* at p. 46, fn. 5.)

"[A] deceased person's heirs and estate 'may incur claims *if someone uses [the deceased's] name to borrow or change asset ownership*; although [the heirs and estate] may eventually escape liability, they may expend enormous amounts of time and money to do so, while their assets are frozen.' " (*Id.* at p. 46, italics added.)

The *Lee* court continued: "Regarding the second purpose of such statutes, ensuring the integrity of judicial and governmental processes, it is again instructive to consider the full scope of section 529, and in this regard too it is apparent that the Legislature intended that the statute would apply to impersonation of a deceased person. As noted above, subdivision 1 of the statute is addressed to impersonation 'before any court or officer authorized to take . . . bail or surety,' and *subdivision 2 addresses, among other things, impersonation by use of a 'written instrument, with intent that the same may be recorded.'* Plainly, impersonation in such situations might be facilitated— and indeed accomplished—by representing oneself as a deceased person. By employing a deceased person's identity, an impersonator may present a more convincing fraud, by, for example, *submitting official documents of the deceased* or by *making use of entries in computer data bases concerning the deceased that* may not have been updated to reflect the circumstance of death. Such an impersonation, accompanied by apparent indicia of reliability, may be more difficult to detect, and hence may pose a greater risk to the integrity of judicial and governmental processes, than impersonation by use of a fictitious identity, or even by use of the identity of a living person (who may be able to expose the fraud). [¶] Consistent with this conclusion, courts of other jurisdictions have observed that impersonation statutes such as section 529 protect society as a whole (and not only the individual impersonated) . . . ." (*Lee, supra,* 22 Cal.4th at pp. 46–47, italics added.)

VIII. *Conclusion*

■   Based on our review of the statutory language in the context of the statutory scheme, and the cases considering former section 529, we come to the following conclusions. First, the provisions enacted together in chapter 8 were intended to protect against the liability and loss—whether personal, financial, or criminal—resulting from fraudulent acts. Section 529 is one of the provisions intended to protect against such loss arising from the impersonation of the victim.

■   Second, former section 529 requires more than mere impersonation. It requires that the impersonator *use*—not just assert—the false identity in one of the ways listed in the three former subdivisions. Without an additional act, the mere impersonation generally constitutes only a misdemeanor. When, for example, the defendant offers a false birth certificate with the intent to

represent himself as another person, he commits a misdemeanor under section 529a. When he possesses a fake driver's license or an official driver's license to which he is not entitled, he commits a misdemeanor under sections 529.5 and 529.7, respectively.[10] And when he falsely identifies himself to an officer during a lawful detention or arrest to evade proper identification by the officer, he commits a misdemeanor under section 148.9.[11] Former section 529

---

[10] Section 529.5 provides: "(a) Every person who manufactures, sells, offers for sale, or transfers any document, not amounting to counterfeit, purporting to be a government-issued identification card or driver's license, which by virtue of the wording or appearance thereon could reasonably deceive an ordinary person into believing that it is issued by a government agency, and who knows that the document is not a government-issued document, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or by a fine not exceeding one thousand dollars ($1,000), or by both the fine and imprisonment. [¶] (b) Any person who, having been convicted of a violation of subdivision (a), is subsequently convicted of a violation of subdivision (a), is punishable for the subsequent conviction by imprisonment in a county jail not exceeding one year, or by a fine not exceeding five thousand dollars ($5,000), or by both the fine and imprisonment. [¶] (c) *Any person who possesses a document described in subdivision (a) and who knows that the document is not a government-issued document is guilty of a misdemeanor* punishable by a fine of not less than one thousand dollars ($1,000) and not more than two thousand five hundred dollars ($2,500). . . . [¶] (d) If an offense specified in this section is committed by a person when he or she is under 21 years of age, but is 13 years of age or older, the court also may suspend the person's driving privilege for one year . . . ." (Italics added.)

Section 529.7 provides: "*Any person who obtains*, or assists another person in obtaining, *a driver's license*, identification card, vehicle registration certificate, or any other official document *issued by the Department of Motor Vehicles, with knowledge that the person obtaining the document is not entitled to the document, is guilty of a misdemeanor*, and is punishable by imprisonment in a county jail for up to one year, or a fine of up to one thousand dollars ($1,000), or both." (Italics added.)

[11] In *People v. Redd* (2010) 48 Cal.4th 691 [108 Cal.Rptr.3d 192, 229 P.3d 101] (*Redd*), the Supreme Court noted that the facts, which were similar to those in the present case, constituted a violation of section 148.9. The issues in that case were different—the defendant challenged the validity of his arrest and search. After committing murder, attempted murder, robbery, and burglary, the defendant (whose full name was Stephen Moreland Redd) was apprehended in a parked car by an officer who approached him because his registration had expired. The defendant told the officer that he had a valid driver's license, but it was not with him. He said he did not have any photographic identification with him, "*but he gave [the officer] a birth certificate in the name of 'Richard Redd' and said that was his name.*" (*Redd, supra,* at p. 712, italics added.) The officer determined there was no record of a driver's license in the name of Richard Redd. The defendant, however, continued to claim he was Richard Redd. When the officer handcuffed and searched him, the officer found his wallet in his pocket. The officer learned from dispatch that there were multiple arrest warrants for the defendant. (*Id.* at p. 713.)

On appeal, the court concluded the arrest and search were valid, stating: " 'Vehicle Code sections 4462 and 12951 long have required that the person in the immediate control of an automobile present evidence of registration and a driver's license upon proper command of a peace officer.' [Citation.] Upon defendant's failure to provide a valid registration and his provision of false identification of himself as 'Richard Redd,' [the officer] had authority to place defendant under arrest. (See § 148.9, subd. (a) [any person who falsely identifies himself to a peace officer upon lawful detention or arrest to evade his proper identification by the investigating officer is guilty of a misdemeanor]; Veh. Code, § 4000 . . . .) Moreover, [the

requires an additional act beyond these false identifications to elevate the crime to a felony, and that act must be more than merely offering an identifying document, such as a driver's license or birth certificate to support the impersonator's false claim of identity. The existence of both section 529 and 529a is compelling evidence that the Legislature intended section 529a to require something different from that required by section 529. We assume the Legislature had section 529 in mind when it later added sections 529a, 529.5, and 529.7—purposely defining new misdemeanor crimes that are distinguishable from section 529 and its additional act requirement. Creating a misdemeanor in section 529a that already existed as a felony in section 529, its nearest neighbor, would have been an utterly irrational legislative act. We will not attribute such a senseless absurdity to the Legislature. (*People v. Sinohui* (2002) 28 Cal.4th 205, 212 [120 Cal.Rptr.2d 783, 47 P.3d 629] [in construing statutes, we avoid an interpretation that would lead to absurd consequences].)

■ Third, former subdivision 2 of section 529 was intended to apply to an additional act in which the impersonator uses the false identity to *create or exploit a written instrument*, generally an instrument that *purports to be the writing of the impersonated person*—for example, the impersonator signs a contract or deed in that person's name, applies for a credit card or loan in that person's name, buys or sells something in that person's name, acknowledges executing a document in that person's name, verifies a document in that person's name, signs or issues a will in that person's name, signs an official birth or death certificate in that person's name (i.e., the doctor's or other official's name), and so on.

■ Here, defendant's only additional act was the offering of his brother's birth certificate to support his oral claim of false identity. He told the officer it was his birth certificate and it proved who he was. This act was "no more than part of the act of providing the false information upon which the false identity was based." (*Cole, supra,* 23 Cal.App.4th at p. 1676 [the act must be more than presenting information regarding the false identity].) It was not enough to satisfy former section 529.

Defendant's conviction must be reversed. Consequently, the other issues raised by defendant are moot.

officer] had authority to search defendant incident to this arrest. [Citation.]" (*Redd, supra,* 48 Cal.4th at pp. 719–720, fn. omitted.)

## DISPOSITION

The judgment of conviction is reversed.

Levy, Acting P. J., and Franson, J., concurred.