Filed 3/12/13  P. v. Rosa CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL EDWARD ROSA,<br><br>    Defendant and Appellant. | F063748<br><br>(Super. Ct. No. VCF231025)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Michael Edward Rosa of (1) stalking, in violation of Penal Code section 646.9, subdivision (a)[1] (one count); (2) false personation, in violation of section 529, subdivision (a)(3)[2] (six counts); (3) identity theft, in violation of section 530.5, subdivision (a) (one count); and (4) unauthorized electronic distribution of personal identifying information, in violation of section 653.2, subdivision (a) (six counts). The charges arose after Rosa engaged in a course of conduct that terrorized his former wife.

Rosa contends there was insufficient evidence to support the stalking, false personation, and identity theft convictions. He does not dispute the evidence, but argues the evidence relied on by the prosecution to support various elements of the crimes was not the type of evidence on which a conviction could be based. We reject each of these arguments and affirm the convictions.

Rosa also raises two issues at sentencing. We conclude there is merit to each of these arguments and will remand the matter to permit the trial court to issue a new abstract of judgment that accurately reflects the time credits Rosa earned before sentencing and to correct two fines that were calculated incorrectly.

## FACTUAL AND PROCEDURAL SUMMARY

### *Evidence in the Trial Court*

Jennifer Vander Tuig[3] had been married to Rosa for approximately 10 years. The couple has two children as a result of the marriage. On several occasions during the marriage, Rosa threatened to kill Jennifer if she left him by chopping her up into little

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

[2]We refer to section 529 in its current form. It was amended in 2011 without substantial changes. (Stats. 2011, ch. 15, § 381, eff. Apr. 4, 2011, operative Oct. 1, 2011.)

[3]Jennifer Vander Tuig was engaged to, and later married, James Vander Tuig. Most of the events occurred during her engagement. To ease the reader's task, we shall refer to her as Jennifer and to him by his first name or as Jennifer's current husband.

pieces and burying her in the oleander plants along Highway 99. The first occasion Rosa made this threat he did so in a joking manner while drinking beer with his friends, but over time Rosa issued the threat whenever the two fought and there was a possibility of divorce.

At one point during the marriage, Rosa was employed by his brother-in-law, Kevin Riordan, in a business called North Idaho Freight Brokers.

Jennifer and Rosa met and lived in California, but eventually moved to Idaho for a short period of time. Jennifer moved back to California when she and Rosa decided to end their marriage. Within weeks of returning to California, Jennifer filed for legal separation.

In approximately April 2009, Rosa moved to California. Jennifer learned this when she saw Rosa following her around town. Rosa followed her on probably three or four occasions.

In April 2009 Jennifer received a phone call shortly after picking up her children. In that phone call Rosa stated he was coming to California to put a bullet between her eyes and a bullet between her current husband's eyes. Jennifer believed Rosa, who owned guns when they lived in Idaho. Jennifer called the police and then moved out of the house for four days because she was afraid Rosa would carry out his threat.

In August 2009 Jennifer was employed at a bank. While at work she received a phone call from a man who said he was calling about her ad on an Internet Web site. Jennifer informed this man he had the wrong number and he hung up. Within the hour she received multiple similar phone calls. Jennifer did not know what the callers were talking about because she had not placed an ad on the Web site and she had not authorized anyone to do so on her behalf. In addition, over a three-week period a dozen or so men whom Jennifer had never met came into the bank asking her about the ad posted on the Web site. One man yelled at her that she should be ashamed, teasing men by placing an ad like that on the Internet. Another man waited at her car for her to get off

3.

work and made rude comments to her. The calls went on for weeks. Jennifer had to change jobs and her residence because of the constant harassment.

Jennifer eventually checked the Web site and found the advertisement in the personal ads section. The ads contained four photographs of Jennifer in the nude that were taken during her marriage to Rosa. Jennifer never intended for anyone to see the photos but Rosa. She never gave Rosa permission to display the photos publicly.

Jennifer was shocked and upset by the advertisement. She called the police and made a report.

Jennifer was in constant fear for her life. She would not go out at night by herself, and she did not permit her children to play outside. She constantly checked to see if Rosa was following her whenever she went to the store.

Kathleen Taylor, Jennifer's mother, received a phone call from Rosa in the spring of 2009. In this phone call Rosa demanded Jennifer's phone number. When Taylor refused the request, Rosa threatened to kill Taylor and Jennifer. Rosa's threats caused Taylor to be frightened. Taylor called Jennifer and then went to her home. That was the last time Rosa called Taylor.

William H. Cooper, Jr., Jennifer's father, spoke with Rosa in April 2009. During that conversation Rosa stated he was going to come to California with two bullets, one for Jennifer and one for her current husband. Cooper called Jennifer to warn her. That was the last phone call Cooper had with Rosa.

Elizabeth Jones, Jennifer's cousin, ran into Rosa in the courthouse. Rosa told Jones he had been working out in mixed martial arts and he hoped to run into Jennifer and her current husband so he could "fuck 'em up." Jones told Jennifer about the threat.

James, Jennifer's current husband, was in Idaho in the spring of 2009 with Jennifer for a child custody hearing. While James was seated outside the courtroom, Rosa stated, "You're gonna get a bullet right between your eyes." James notified the police and he and Jennifer were escorted out of the courthouse by police officers.

James explained that as a result of Rosa's threats, Jennifer had become "really terrified, fear[ed] for her life," and was afraid to leave the house.

James also saw nude photos of Jennifer posted on an Internet Web site. Jennifer was with him at the time and was very upset. The photos caused significant stress in their lives.

Debra Kwake is Rosa's sister and was married to Kevin Riordan, who died in January 2009. Riordan worked full time at a medical center, but he also set up a business called North Idaho Freight Brokers to make extra money. The business apparently arranged transportation of freight on trucks. Rosa was in the same business, and the two worked together. Kwake did not give Rosa permission to use the business name North Idaho Freight Brokers at any time after Riordan died.

Rosa lived with Kwake for a short while in early 2009. While living there, Rosa told Kwake he had some nude pictures of Jennifer that a friend was going to post on the Internet in a way that no one would be able to learn who had done so.

James William Kelly, a corporal with the Tulare Police Department, investigated the Web site postings. As the result of subpoenas he issued, Kelly learned the Internet Protocol (IP) address (67.187.225.193) and e-mail address (allupinyah1@yahoo.com) of the person who had posted the advertisements purportedly from Jennifer. Using this information, Kelly obtained from the Web site provider seven different advertisements purportedly posted by Jennifer. The advertisements stored by the Web site service provider included only text. Each advertisement was similar and provided Jennifer's name and stated she wanted to meet men for oral sex. The advertisements Kelly was able to locate online included nude pictures of Jennifer that had been taken by Rosa during their marriage. Each of the advertisements had been taken down after only a short time.

Kelly subpoenaed the records from the Internet service provider to identify the subscriber identified by the IP address that had posted the advertisements. The Internet

service provider provided records that identified the subscriber's address as 610 North Bonita Drive, Tulare, California.

A search warrant was obtained for 610 North Bonita Drive and, when it was executed, Kelly found the address was Rosa's residence. A computer was seized during the search.

Rosa was interviewed during the search. Rosa initially denied, but eventually admitted, that he had posted the personal advertisements allegedly from Jennifer. He also admitted that allupinyah1@yahoo.com was his e-mail account. He also admitted he had nude pictures of Jennifer on his laptop.

Robert Ellison lived with Rosa in the summer of 2009 at 610 North Bonita Drive, Tulare, California. Rosa told Ellison he had put a picture of Jennifer on an Internet Web site and included a message to "Call for a good time." In the picture Jennifer was naked.

A representative from the Web site testified an advertisement was posted using the e-mail address of allupinyah1@yahoo.com. A copy of the posting was entered into evidence.

A representative from an Internet service provider established that North Idaho Freight Brokers started an Internet service account on July 8, 2009, and terminated the service on October 7, 2009. The service was provided to 610 North Bonita Drive, Tulare, California. The IP address for the service was 67.187.225.193.

### Charges

The information charged Rosa with one count of stalking (§ 646.9), seven counts of false personation (§ 529), one count of unauthorized use of personal identifying information (identity theft) (§ 530.5), and seven counts of unauthorized electronic distribution of personal identifying information (§ 653.2).

*Verdict and Sentencing*

The jury found Rosa guilty of stalking, identity theft, six counts of false personation, and six counts of unauthorized electronic distribution of personal information. Rosa was found not guilty of one count of false personation and one count of unauthorized electronic distribution of personal information.

The trial court sentenced Rosa to the midterm of two years for the stalking and an additional eight months for one count of false personation. The sentences on the remaining counts were either imposed concurrently or stayed pursuant to section 654.

## DISCUSSION

### I.    False Personation

Rosa was convicted in counts three through eight of false personation, in violation of section 529. This section criminalizes a defendant's use of another person's identity under specific circumstances. Rosa was convicted under subdivision (a)(3), which, as relevant here, punishes using another person's identity for any act "whereby any benefit might accrue to the party personating, or to any other person."

The prosecution argued that Rosa violated this code section when he posted the seven personal advertisements on an Internet Web site, which included nude photographs of Jennifer and offered sexual services.[4] Rosa concedes he posted the personal advertisements, but asserts the convictions cannot stand for two reasons.

First, he argues that no benefit accrued to him, and therefore he did not violate the statute. Second, he argues he did not do an act in addition to impersonating Jennifer, which is necessary under the statute.

---

[4]Seven personal advertisements were posted, but the jury convicted Rosa of only six counts of violating section 530.5.

7.

*Benefit*

The parties each cite *People v. Rathert* (2000) 24 Cal.4th 200 (*Rathert*), which defines the mental state required to violate the statute. The Supreme Court concluded that section 529, subdivision (a)(3) "is violated when one intentionally falsely personates another and, in such assumed character, does *any* act that *might* cause the liability or benefit described in the statute. [Subdivision (a)(3)], in other words, requires the existence of no state of mind or criminal intent beyond that plainly expressed on the face of the statute." (*Rathert,* at p. 202.)

The Supreme Court's explanation of how it reached this conclusion is enlightening: "Section 529, [subdivision (a)(3)] does not explicitly require that a defendant who impersonates another specifically intend to cause the latter to become liable to any suit or prosecution or to pay any sum of money, or specifically intend to benefit defendant himself or another person. The Legislature included in [subdivision (a)(3)] none of the language typically denoting specific intent, such as 'with the intent that' or 'for the purpose of.' [Citation.] To the contrary, [subdivision (a)(3)] is framed in language reasonably susceptible of only one interpretation: that the Legislature sought to deter and to punish all acts by an impersonator that might result in a liability or a benefit, whether or not such a consequence was intended or even foreseen. No fewer than seven times does the word 'any' appear in the statute: '[A]*ny* other act … in *any* event … *any* suit or prosecution … *any* sum of money … *any* charge … *any* benefit … *any* other person.' [Citation.] The impersonator's act, moreover, is criminal provided it *might* result in any such consequence; no higher degree of probability is required." (*Rathert, supra,* 24 Cal.4th at pp. 205-206.)

In *People v. Vaughn* (1961) 196 Cal.App.2d 622, also cited by the parties, the appellate court rejected the defendant's argument that section 529, subdivision (a)(3) required pecuniary or material benefit. "[T]he word 'benefit' as used in the statute is not

limited to pecuniary or material gain. The word 'benefit' denotes any form of advantage. [Citations.]" (*Vaughn,* at p. 630.)

These cases establish that the word "benefit," as used in the statute, is defined broadly as any form of advantage that may possibly accrue to the defendant. As noted by the Supreme Court in *Rathert*, the Legislature used the term "any" no fewer than seven times in section 529, subdivision (a), including modifying the term "benefit." Nor did the Legislature attempt to limit the type of benefit that would support criminal prosecution in any manner, such as requiring the benefit derived to be tangible or monetary in nature. This is a clear indication that the Legislature intended the term "benefit" to be interpreted broadly.

Undoubtedly, Rosa performed the acts to cause emotional pain, suffering, and embarrassment to Jennifer and to damage her reputation. Indeed, it is inconceivable that he would have performed these acts except for the expectation that Jennifer would be harmed. Also, Rosa created the strong possibility that he would benefit in his ongoing custody dispute with Jennifer. We conclude the satisfaction that Rosa received from this anticipated harm and the anticipated impact on the divorce case were benefits to Rosa within the meaning of section 529, subdivision (a)(3).

*Additional Act*

Rosa also argues these convictions must be overturned because the only act he performed was impersonating Jennifer. As explained in *People v. Cole* (1994) 23 Cal.App.4th 1672, 1675 (*Cole*), in addition to the act of impersonation, the People were required to prove an act in addition to the act of impersonating Jennifer that benefitted Rosa or some other person. Rosa asserts there was no evidence of an additional act.

Rosa views the evidence much too broadly. Rosa's act of impersonating Jennifer was complete when the personal advertisement he created stated that Jennifer had placed the advertisement ("My name is Jennifer"). He did much more than simply state the advertisement was from Jennifer. He also solicited sex on her behalf and then posted

9.

nude photographs of her on the Web site. These were two additional acts within the meaning of the statute.

The facts in *Cole* and *People v. Robertson* (1990) 223 Cal.App.3d 1277 (*Robertson*), the cases cited by the parties, are much different.

Cole was arrested for burglary, apparently while he was awaiting trial on another felony charge. He gave the arresting officer a false name and the impersonated individual's date of birth. He also confirmed to the officer the middle name of the impersonated individual after the officer checked the name in a police database.

The appellate court concluded that Cole had not committed a separate act apart from impersonating another person. (*Cole, supra,* 23 Cal.App.4th at p. 1675.) In reaching this conclusion, the appellate court rejected the People's argument that Cole committed separate acts when he gave the officer the birth date of the impersonated individual and confirmed the middle name of the impersonated individual. "Here, however, giving a false birth date and middle name was no more than part of the act of providing the false information upon which the false identity was based. Each statement made in the course of providing contemporaneous statements amounting to false identification logically cannot be construed as separate acts compounding each prior statement." (*Id.* at p. 1676.)

Robertson was arrested for vehicle theft. When arrested, Robertson falsely identified himself using his brother's name. Robertson signed his brother's name on the booking form. Robertson continued the impersonation at his arraignment. He was released on his own recognizance but failed to appear at the next hearing. A bench warrant was issued. Robertson's brother was arrested in Texas and extradited to California where he was found incompetent to stand trial. Authorities discovered they had the wrong individual in custody approximately 18 months after Robertson's brother was committed to a mental hospital.

While the issue in *Robertson* was unrelated to the question of whether Robertson had committed a separate act, the appellate court did note that it "[found] no basis to upset" the determination that Roberson had violated section 529, subdivision (a)(3). (*Robertson, supra,* 223 Cal.App.3d at p. 1283.)  On that basis, we can assume the appellate court found that Robertson had committed a separate act, a conclusion with which we agree.  Not only did Robertson impersonate his brother, he also signed numerous documents with the assumed name and appeared in court for an arraignment on a crime his brother had been accused of committing.  Undoubtedly, these were separate acts within the meaning of the statute.

*People v. Chardon* (1999) 77 Cal.App.4th 205 (*Chardon*) addressed the separate act requirement.  Chardon was driving with a suspended license when she was stopped for speeding.  She gave her sister's name to the officer and claimed not to have her driver's license with her.  The officer cited her for the traffic violation, and Chardon signed her sister's name to the citation.

Chardon argued there was no evidence she committed any act other than impersonating her sister.  The appellate court disagreed, concluding that when Chardon signed her sister's name to the citation she committed the requisite additional act that subjected her sister to criminal prosecution.  (*Chardon, supra,* 77 Cal.App.4th at p. 212.)  The appellate court also rejected Chardon's argument that the separate act must occur on a different occasion.  "[T]he statute does not require the additional act to occur on a *separate occasion*.  Penal Code section 529[, subdivision (a)(3)] only requires that there *be* an additional act by the perpetrator which exposes the impersonated person to liability or benefits the perpetrator or another." (*Id.* at pp. 212-213.)

*People v. Casarez* (2012) 203 Cal.App.4th 1173 also addressed the additional act requirement.  Casarez was riding in a vehicle that was stopped by officers for a traffic violation.  A warrant had been issued for his arrest.  When asked his name, Casarez gave his brother's name.  Casarez had his brother's birth certificate in his possession for the

11.

purpose of establishing the false identity. The officers were not convinced and were able to confirm Casarez's true identity and arrested him.

Casarez argued to this court that the evidence was insufficient to establish a separate act in addition to impersonating his brother. Casarez was prosecuted under section 529, subdivision (a)(2), which punishes the act of verifying, publishing, acknowledging, or providing any written instrument in the impersonated person's name with the intent that the written instrument be recorded, delivered, or used as true. In concluding the statute had not been violated, we observed "section 529 requires more than mere impersonation. It requires that the impersonator *use*—not just assert—the false identity in one of the ways listed in the three … subdivisions. Without an additional act, the mere impersonation generally constitutes only a misdemeanor. " (*Casarez, supra,* 203 Cal.App.4th at p. 1190.)

Finally, this issue was addressed in *People v. Stacy* (2010) 183 Cal.App.4th 1229 (*Stacy*). Stacy gave her cousin's name when she was stopped for suspected driving while intoxicated. She was arrested and transported to the police station where she repeatedly gave the same false name. She also refused to complete the breathalyzer test and refused permission for a blood draw, even after being informed her driving privilege would be suspended if she did not cooperate. She finally allowed a blood draw, although she did not consent or assist in the procedure.

Stacy argued there was insufficient evidence that she committed an act in addition to impersonating her cousin. The appellate court noted that "[t]he additional act required by section 529 is something beyond, or compounding, the initial false personation to the arresting officer; it must be more than simply providing information regarding the false identity. [Citations.]" (*Stacy, supra,* 183 Cal.App.4th at p. 1235.) It concluded, however, that Stacy had committed a separate act when she refused to complete the chemical test because doing so exposed her cousin to an immediate suspension of her driving privilege.

While the acts in this case are far different than those in the cited cases, which comprise virtually every published decision addressing the issue, we are confident we have reached the correct conclusion. Rosa went beyond impersonating Jennifer. He used Jennifer's identity to solicit sex and to humiliate her by publishing pictures of her in the nude. His actions were designed to injure Jennifer, which provided him with some satisfaction, and also created the strong possibility that he would benefit in his dealing with her on child custody issues or other unresolved issues related to their divorce. Accordingly, we conclude there was substantial evidence to support the convictions.

## II.     Stalking

Rosa contends the stalking conviction must be reversed because he did not have the ability to carry out the threats at the time they were made because he was living in Idaho, and Jennifer resided in California. According to Rosa, the distance between them rendered the threat incredible because he did not have the apparent ability to carry out the threat.

Section 646.9, subdivision (a), the statutory basis for Rosa's stalking conviction, prohibits willful conduct that maliciously harasses another and includes a credible threat to harm that person.[5] Rosa's argument focuses on whether he made a credible threat as

---

[5]Section 646.9, subdivision (a) states in full: "(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison. [¶] (b) Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, shall be punished by imprisonment in the state prison for two, three, or four years. [¶] (c)(1) Every person who, after having been convicted of a felony under Section 273.5, 273.6, or 422, commits a violation of subdivision (a) shall be punished by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state

13.

prison for two, three, or five years.  [¶] (2) Every person who, after having been convicted of a felony under subdivision (a), commits a violation of this section shall be punished by imprisonment in the state prison for two, three, or five years.  [¶] (d) In addition to the penalties provided in this section, the sentencing court may order a person convicted of a felony under this section to register as a sex offender pursuant to Section 290.006.  [¶] (e) For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose.  [¶] (f) For the purposes of this section, 'course of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose.  Constitutionally protected activity is not included within the meaning of 'course of conduct.'  [¶] (g) For the purposes of this section, 'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family.  It is not necessary to prove that the defendant had the intent to actually carry out the threat.  The present incarceration of a person making the threat shall not be a bar to prosecution under this section.  Constitutionally protected activity is not included within the meaning of 'credible threat.'  [¶] (h) For purposes of this section, the term 'electronic communication device' includes, but is not limited to, telephones, cellular phones, computers, video recorders, fax machines, or pagers.  'Electronic communication' has the same meaning as the term defined in Subsection 12 of Section 2510 of Title 18 of the United States Code.  [¶] (i) This section shall not apply to conduct that occurs during labor picketing.  [¶] (j) If probation is granted, or the execution or imposition of a sentence is suspended, for any person convicted under this section, it shall be a condition of probation that the person participate in counseling, as designated by the court.  However, the court, upon a showing of good cause, may find that the counseling requirement shall not be imposed.  [¶] (k)(1) The sentencing court also shall consider issuing an order restraining the defendant from any contact with the victim, that may be valid for up to 10 years, as determined by the court.  It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family.  [¶] (2) This protective order may be issued by the court whether the defendant is sentenced to state prison, county jail, or if imposition of sentence is suspended and the defendant is placed on probation.  [¶] (l) For purposes of this section, 'immediate family' means any spouse, parent, child, any person related by consanguinity or affinity within the second degree, or any other person who regularly resides in the household, or who, within the prior six months, regularly resided in the household.  [¶]

14.

required by the statute. A credible threat is defined as a "verbal or written threat … made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety … and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety .…" (*Id.*, subd. (g).)

Implicit in Rosa's argument is the assertion that only threats that can be carried out immediately after being made, or a very short time after being made, are credible threats. We disagree.

We first note the timeframe Rosa is arguing must be met is very narrow. While Rosa apparently was in Idaho when the threat was made, the time to drive from Idaho to Tulare County is approximately 13 hours, and the flight time considerably less.[6]

In essence, Rosa's argument seeks to add language to the statute. As the portion of the statute quoted above establishes, section 646.9 requires only an apparent ability to carry out the threat so that the target reasonably fears for his or her safety. Rosa would have us read the statute as requiring an apparent ability *immediately* to carry out the threat. It is not our province to add words to the statute the Legislature has not deemed necessary, especially when it would change the meaning of the statute significantly.

Rosa has not cited any case to support this assertion, nor could we locate such a case. The cases cited by Rosa, *People v. Borrelli* (2000) 77 Cal.App.4th 703, *People v. Halgren* (1996) 52 Cal.App.4th 1223, *People v. Falck* (1997) 52 Cal.App.4th 287, and *People v. McClelland* (1996) 42 Cal.App.4th 144, address situations where the threats

(m) The court shall consider whether the defendant would benefit from treatment pursuant to Section 2684. If it is determined to be appropriate, the court shall recommend that the Department of Corrections and Rehabilitation make a certification as provided in Section 2684. Upon the certification, the defendant shall be evaluated and transferred to the appropriate hospital for treatment pursuant to Section 2684."

[6]It is unclear from the record of Rosa's exact location in Idaho at the time the threat was made.

were made by an individual located in the vicinity of the purported victim. None of these cases, however, imposes such a requirement.

The statute requires the apparent ability to carry out the threat. This portion of the statute refers to the person making the threat. That Rosa possessed guns and the ability to travel from Idaho to California was substantial evidence that he had the ability to carry out his threat within the meaning of the statute.

While the "apparent ability to carry out the threat" requirement of section 646.9 may preclude a conviction under some undefined circumstances, this is not that case.

## III.    Identity Theft

Rosa was convicted in count nine of identity theft, in violation of section 530.5, subdivision (a). This section makes it unlawful for a defendant willfully to obtain the personal identifying information of another and then use "that information for any unlawful purpose" without the consent of the person whose identity was obtained. The statute also lists examples of unlawful purposes, such as obtaining credit, goods, services, real property, or medical information. "[T]o be guilty under section 530.5, subdivision (a), the defendant must (1) willfully obtain personal identifying information of another person, and (2) use the identifying information for an unlawful purpose without the person's consent." (*People v. Tillotson* (2007) 157 Cal.App.4th 517, 533.)

Rosa focuses on the second element of the crime -- the use of Jennifer's identifying information for an unlawful purpose. He argues his conduct, in assuming Jennifer's identity and posting on the Internet personal advertisements soliciting sex, was not unlawful under the statute.

This court rejected this argument in *In re Rolando S.* (2011) 197 Cal.App.4th 936 (*Rolando S.*). Someone sent Rolando the e-mail address and password of a female classmate. Rolando used this information to change the classmate's Facebook password. Rolando, posing as the classmate, then posted messages on other individuals' Facebook

16.

pages suggesting they get together for sex. Rolando also changed the classmate's Facebook profile, including a statement that she enjoyed engaging in oral copulation.

The juvenile court found true a petition charging Rolando with, among other criminal violations, identity theft, in violation of section 530.5, subdivision (a). Rolando argued his conduct was not unlawful under the statute. After reviewing the legislative history of the statute, particularly the 1998 amendment to the statute (Stats. 1998, ch. 488, § 1, p. 3531) that added the phrase "any unlawful purpose," we explained:

> "Prior to the amendment, identity theft was a misdemeanor crime and had to specifically involve the perpetrator's use of the victim's information 'to obtain, or attempt to obtain, credit, goods, or services' in the name of the victim without his or her consent. [Citation.] In adding 'for any unlawful purpose, including' before the clause beginning 'to obtain,' the amendment expanded the range of unlawful purposes for which a perpetrator could be found guilty of committing identity theft and specifically denoted the nonexclusive nature of the list of unlawful purposes set forth in the statute. The Legislature clearly intended to greatly expand the scope of unlawful conduct underlying the identity theft offense." (*Rolando S., supra,* 197 Cal.App.4th at pp. 944-945, fn. omitted.)

After noting the Legislature had not done anything to narrow the type of conduct that could violate the statute, we concluded that the phrase "any unlawful purpose" included more than just criminal acts.

> "Crimes are strictly creatures of penal statutes, and require both a prohibited act and a punishment. [Citation.] Our Supreme Court has defined the term 'unlawful' to include wrongful conduct which is not criminal. In determining the scope of the term, it held that an act is 'unlawful … if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard. [Citation.]' [Citation.] Under this definition, unlawful conduct includes acts prohibited by the common law or nonpenal statutes, such as intentional civil torts.

> "Libel is an intentional tort. [Citation.] Civil Code section 45 defines the civil tort of libel: 'Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to

injure him in his occupation.'  Appellant practically concedes the point, arguing the 'prosecution proved only that [appellant] humiliated, embarrassed, and defamed [the victim].'  Here, appellant wrote sexually explicit and vulgar comments on the victim['s] friends' walls, accessible by the victim['s] friends and acquaintances, and purportedly as her.  Appellant clearly exposed the victim to hatred, contempt, ridicule and obloquy with his actions." (*In re Rolando S., supra,* 197 Cal.App.4th at pp. 946-947, fn. omitted.)

Rosa is in a virtually identical position.  He used Jennifer's personal information to pose as her on the Internet and post sexually explicit and vulgar comments in a personal advertisement on a Web site page available to be seen by anyone with access to the Internet.  In doing so, he exposed Jennifer to hatred, contempt, ridicule, and obloquy within the meaning of Civil Code section 45 and exposed himself to prosecution for identity theft.

## IV.    Sentencing

Rosa asserts three errors were made at sentencing.

The People concede that the fines imposed pursuant to Penal Code section 1465.8 and Government Code section 70373 are incorrect.  Each fine is imposed once for each conviction.  The probation report incorrectly counted the number of convictions as 14 instead of 12.  As a result, the fines imposed pursuant to these code sections are greater than permitted.

The remaining issues concern the amount of conduct credit Rosa was entitled to for time spent in custody before sentencing and the accuracy of the written order and the abstract of judgment.  The trial court orally awarded Rosa 70 days' credit, consisting of 35 days in custody and 35 days conduct credit.  The written order for the sentencing hearing states, "Defendant given credit for 51 days actual time plus 35 days conduct credit for a total of 8 days served awaiting sentence," which is obviously incorrect.  The abstract of judgment lists the total credits as 51 days, 35 days for time in custody, plus eight days of conduct credit, which does not total 51 days.

Rosa argues he is entitled to the 70 days of credit, while the People disagree. Both parties agree that section 4019 governs the issue. We must determine which version of section 4019, which repeatedly has been amended, was in effect at the time of Rosa's crimes.

Rosa committed these crimes in 2009 and 2010. In 2009, section 4019 provided that for each four days spent in custody, Rosa was entitled to credit for six days if he qualified for good conduct and worktime credit. (Former § 4019, subds. (b), (c), (f), as amended by Stats. 1982, ch. 1234, § 7, pp. 4553-4554.) Effective January 25, 2010, section 4019 was amended to provide that for every two days actually spent in custody, the defendant was entitled to a total credit of four days. (Former § 4019, subds. (b), (c), (f), as amended by Stats. 2009, 3d Ex. Sess. 2009-2010, ch. 28, § 50.)

Effective September 28, 2010, section 4019 again was amended to provide that qualified prisoners would earn six days of custody credit for every four days spent in custody. (Former § 4019, subds. (b), (c), (f), as amended by Stats. 2010, ch. 246, § 2.) However, subdivision (g) of section 4019, added by the amendment, stated that the changes would apply only to crimes committed after the effective date of the amendment, or September 28, 2010. All of Rosa's crimes were committed before September 28, 2010. Although section 4019 subsequently has been amended, subdivision (g) has not changed, so that all amendments apply only to crimes committed after the effective date of the amendment.

Accordingly, Rosa was entitled to be sentenced under the version of section 4019 that was effective on January 25, 2010, and was entitled to four days of custody credit for each two days actually served, assuming he qualified for good conduct and work credits. Since the trial court awarded him full credits, we must assume Rosa qualified for the credit. Accordingly, the trial court's oral pronouncement of judgment was correct, and the abstract of judgment must be corrected.

**DISPOSITION**

The convictions are affirmed, but the matter is remanded to the trial court to correct the erroneous fines and the time credits stated in the abstract of judgment. The trial court is directed to prepare a corrected abstract of judgment and to forward a certified copy of the abstract to the appropriate authorities.

_____
CORNELL, Acting P.J.

WE CONCUR:


_____
KANE, J.


_____
POOCHIGIAN, J.